UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| WESLEY SCOTT, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge Joan B. Gottschall |
| v. | ) | |
| | ) | Case No. 09 C 6128 |
| TOWN OF CICERO, LARRY DOMINICK | ) | |
| and ANTHONY INIQUEZ, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Wesley Scott, who is African-American, filed suit against the Town of Cicero ("Cicero"), Larry Dominick and Anthony Iniquez (together, "the individual defendants"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as well as the Civil Rights Act of 1866, 42 U.S.C. § 1981. According to Scott, despite his decorated service as a police officer, the defendants recommended the termination of his employment based on an arrest for possession of marijuana—even though the case was dismissed, and even though non-African-American employees who "committed offenses much more egregious" were not treated in a similar fashion. Scott claims that Dominick and Iniquez made the recommendation public, which resulted in his public humiliation and deprived him of the respect he needed to perform his job, in turn causing his constructive discharge from the police department. The individual defendants and Cicero have now filed separate motions for summary judgment. For the reasons stated below, the court grants both motions.

# I. BACKGROUND

The following facts are undisputed unless otherwise noted.[1] On January 27, 2008, Scott left home in his car. As he was driving toward an intersection, he came upon a stop sign. Chicago police officers stopped him, claiming that he did not stop his vehicle as required. Scott exited the vehicle at a gas station, and heard the police calling him over. While the details are not clear from the parties' statements of fact, somehow the police located a bag containing cannabis in Scott's vehicle. As the sole occupant of the vehicle, Scott was arrested and charged with possession of the drug.

At the time of the arrest, Scott was a commander with Cicero's police department. Cicero had hired him as a probationary police officer back in 1986, and he was the first African-American employed as an officer with Cicero. Scott had worked in every department, culminating in his promotion to commander. Thus, he was aware of various

---

[1] Both sides to the dispute make a number of improper denials in their respective responses to the others' Local Rule 56.1 Statements of Fact. For example, the defendants coyly attempt to "object" to facts on grounds such as vagueness, lack of foundation or relevance instead of straightforwardly admitting or denying those facts (*e.g.*, Resp. to Pl.'s SOF ¶¶ 52-57, 59-60, 66-68); they attempt to play word games by admitting only that a given statement of fact "accurately reflects" deposition testimony without any attempt to introduce any evidence that would contradict such testimony (*e.g.*, *id.* ¶¶ 56-57, 59, 61-68); they try to introduce new facts (*e.g.*, *id.* ¶¶ 54-55); and they offer general denials without citing any evidence in support of their objection, (*e.g.*, *id.* ¶ 68). The only one of Scott's facts not already addressed is ¶ 58, and although the defendants claim that the "cited deposition testimony does not state what plaintiff alleges" (without offering any further explanation), the defendants are mistaken—the deposition testimony cited supports Scott's purported fact. But neither is Scott innocent of such conduct. Not only did Scott fail to comply with the court's standing order (which states that "[c]itations to facts in the memorandum must be to both the 56.1(a)(1) documents establishing the fact and to the 56.1(a)(3) statement"), but Scott also attempts to deny various statements of fact by citing chapter and verse of deposition testimony—testimony that is consistent with the defendants' purported fact, and which appears to be an improper attempt to introduce additional facts into the process. (*See* Resp. to Defs.' SOF ¶¶ 29, 36, 43.) In other instances, Scott fails to cite any evidence in support of his denials. (*See id.* ¶¶ 41, 45, 49.) As this court notes in its standing order, "[f]ailure of the parties to heed the requirements of Rule 56 of the Federal Rules of Civil Procedure and Local General Rules 56.1(a) and 56.1(b) . . . greatly complicates this court's consideration of motions for summary judgment." While the rules may seem trivial, they are critical in allowing the court to focus on the issues in dispute and resolve those issues on the merits. *See Metropolitan Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002) (noting that a district court has discretion "to require strict compliance with its local rules governing summary judgment") (citation omitted). For these reasons, all of Scott's statements of fact, as well as the defendants' statements of fact ¶¶ 29, 36, 41, 43, 45 and 49, are deemed admitted *except* that the court will not treat as admitted the parties' conclusory statements regarding whether similarly situated comparators were treated differently. *See Oest v. Ill. Dep't Corr.*, 240 F.3d 605, 614 (7th Cir. 2001); *Haywood v. N. Am. Van Lines*, 121 F.3d 1066, 1071 (7th Cir. 1997).

relevant Cicero policies that governed his behavior, as well as the drug policy in his collective bargaining agreement. Scott understood that if he were smoking marijuana, such behavior would be absolutely improper under Cicero's standards, that he was obliged to be forthright and honest, and that he was obliged to cooperate fully with any competent authority conducting a department personnel investigation.

Following his arrest, officers contacted Cicero's police department. Commander Boyle, who was working in the Internal Affairs Division, met with one of the officers to discuss the incident. Thereafter, Boyle prepared an internal complaint and a File Initiation Report. Anthony Iniquez, the Chief of Police, wanted Scott to resign immediately, but told Scott that if he took a drug test and passed he would be placed back on duty. Scott was ordered to submit to a urine drug test, and he was provided with an hour-long window of time on February 1, 2008 in which to do so.

The parties debate the results. Based upon selective quotation, Scott insists upon treating the results as if they were conclusively negative, but although the report states that the test was negative, it also includes a special note: "Please note that the specimen is dilute. Recommend observed collection." Dr. Khanna, the medical review officer who signed the report, testified that he observed Scott's urinary creatinine to be below 20 milligrams per deciliter and to have a specific gravity over 1.003, which was an atypical reading. Although Dr. Khanna did not draw any ultimate conclusion about Scott's result, he opined that a specimen could be dilute for one of three reasons: the specimen had been altered by the individual being tested, the individual had ingested an excessive amount of fluids in an attempt to dilute the specimen, or the individual had some underlying kidney problem that prevented him from being able to concentrate urine adequately. Thus, Dr.

Khanna recommended that a new specimen be collected while Scott was under observation. For his part, Scott claimed not to be aware of any dilution of his urine sample.

On February 19, 2008, Scott was sent back to the same location after being ordered to take a hair follicle test. Scott knew, before taking the test, that the test was designed to detect the presence of drugs.[2] Scott's mug shot photograph establishes that he has a mustache at the time of his arrest, but the mustache was gone by the time of the hair follicle collection. Dr. Khanna testified that his assistant told Dr. Khanna that Scott had virtually no hair on his entire body, including his arms and legs.[3] In Dr. Khanna's eighteen years of practice, this was the only case he had observed where the individual being tested had virtually no body hair. The assistant attempted to do the best he could to collect as much hair as possible, but nonetheless Scott's test results came back as having "insufficient quantity." Dr. Khanna opined that one way someone could avoid detection

---

[2] The parties disagree over this point, but Scott's deposition testimony establishes that while he did not know that the hair follicle test could be used to detect the presence of drugs prior to his arrest, he understood the purpose of the test before he actually submitted to it:
    Q:    When you were told that you were going to have to submit to a hair follicle test, did you quickly determine that that was the reason why they wanted you to take it, to determine the possible historical presence of drugs?
    A:    Yes.
    Q:    Okay. And you knew that before you submitted yourself for [the] test?
    A:    I didn't. I only found that out that [sic] they told me I took the wrong test.
    Q:    No. No. No. When you took the urinalysis, they told you that?
    A:    Yes.
****
    Q:    So before you went for the hair follicle test, did you know that the test was designed as another test to detect the presence of drugs?
    A:    Yes.
(*See* Scott Dep. at 90:17 – 92:1.)

[3] Despite the defendants' statement of fact to the contrary, the portion of Dr. Khanna's testimony to which the defendants point in support does not say anything about eyebrows or pubic area. In fact, Dr. Khanna later stated only that he "would assume" that the pubic area was checked, but he did not specifically recall if that was true in this case. (*See* Khanna Dep. at 15:12-14 & 27:6-19.) Dr. Khanna also testified that he did not observe or could not recall whether Scott had eyebrows or eyelashes at the time. (*Id.* 32:14 – 33:6.)

of drugs in a hair follicle test would be to shave off all of their hair so that the clinic could not collect a valid specimen. Scott claimed that he suffered from a condition called "pseudofolliculitis barbae," which meant that the hair on his face curled into his skin; Scott also used to shave his body hair to compete in bodybuilding, but had stopped that type of shaving in 2003. He admitted that he does not shave all the hair on his body on a regular basis.

The criminal case against Scott was dismissed when Scott agreed to participate in a four-week drug-school program. On May 29, 2008, Larry Dominick, Cicero's President, wrote a letter to Scott indicating he was seeking Scott's termination even though Scott's charges had been dismissed, as Scott's conduct was "unbecoming of a Town of Cicero Police Commander."[4] Commander Boyle prepared a formal investigation report, and Iniquez filed disciplinary charges against Scott. Both Boyle and Iniquez also recommended Scott's termination. The parties began to litigate the disciplinary charges—Scott filed a motion to dismiss—but then Scott elected to resign instead of proceeding with a hearing before the Board of Fire & Police Commissioners. By doing so, Scott received all the benefits to which he was entitled, including vacations and sick leave. Scott testified that he retired without a hearing because he "had no faith in the process" and "wasn't going to gamble with the 22 years that [he] had worked" by putting his faith in people who "simply do whatever the Town asks."

Scott points to a number of individuals that he claims are similarly situated and received better treatment. Scott also admits that he has no knowledge or information that

---

[4] Scott and Dominick had some history: both were on the police force prior to Dominick becoming the President of Cicero. During that time, when they had disagreements, Dominick would not speak with Scott privately and would instead go to Scott's supervisors or partners to discuss the issue. When Scott was promoted to commander, he visited Dominick to learn what the job entailed; Dominick indicated that Scott was appointed only by recommendation of the Chief, and Dominick had no influence over the process.

anyone admitted to treating him differently than any of those individuals because he was African-American.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the court will grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In particular, the court will grant a motion for summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

At the summary judgment stage, "a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party." *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). "A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Id.* at 628 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). Doubts about the existence of a material fact "should be resolved in favor of the nonmoving party and summary judgment ought to be denied." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994).

## III. ANALYSIS

Scott's complaint alleges that non-African-American employees were not recommended for termination by Iniquez and Dominick, and that he was constructively discharged after Dominick and Iniquez made public their recommendation that he be

terminated. In Count I of his complaint, he alleges that Cicero violated Title VII; in Count II, he alleges that both the individual defendants and Cicero violated 42 U.S.C. § 1981. Cicero and the individual defendants filed separate motions for summary judgment, but both motions contain significant overlap—indeed, Scott's response to the two motions is largely identical—and so they will be addressed simultaneously. *See Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 782 (7th Cir. 2006) ("[T]he same standards governing liability under Title VII apply to section 1981.") (quotation marks and citation omitted).

A plaintiff can establish his *prima facie* case of racial discrimination via the direct or indirect method of proof, "or a combination of the two." *See Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 672-73 (7th Cir. 2012). Here, Scott argues that he has satisfied both. The court addresses each method in turn, starting with the indirect method of proof.

**A. Indirect Proof of Discrimination**

Under the indirect method of proof, Scott must satisfy four requirements to establish a *prima facie* case of discrimination: he must show that (1) he is a member of a protected class; (2) his performance met his employer's legitimate expectations; (3) despite this performance, he was subjected to an adverse employment action; and (4) his employer treated similarly situated employees outside of the protected class more favorably. *See Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 554 (7th Cir. 2011); *Lucas v. Chi. Transit Auth.*, 367 F.3d 714, 728 (7th Cir. 2004) (noting that the second and fourth prongs of this test "merge" when the allegation relates to disparate punishment). Only after Scott establishes this *prima facie* case does the burden shift back to the defendants to "articulate a legitimate, non-discriminatory reason for the adverse employment action."

*See South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 751 (7th Cir. 2007). If the defendants can do so, the ultimate burden shifts back to Scott to present evidence showing that the defendants' purported reason for the adverse action was pretextual. *Id.*

Here, the parties concede that Scott, as an African-American, is a member of a protected class. Moreover, at least up until the arrest, there is no debate that Scott was performing according to his employer's legitimate expectations. *See Lucas*, 367 F.3d at 728 (where disparate discipline is alleged, "there is no question that the employee failed to meet his employer's expectations. Instead, the plaintiff must establish that he received dissimilar—and more harsh—punishment than that received by a similarly situated employee who was outside the protected class"). The court therefore focuses on two issues: whether Scott was subjected to an adverse employment action and, if so, whether Scott was treated differently than his similarly situated co-workers.

1. Adverse Employment Action

Scott alleges that he was recommended for termination by Dominick and Iniquez, that the recommendation was made public, and that as a result he was constructively discharged. Where an employee's supervisor is motivated by a discriminatory animus in recommending the employee's termination, the adverse employment action can result in liability for the employer. *See Smith v. Bray*, --- F.3d ---, 2012 WL 1871855, at *8 (7th Cir. 2012) (when a supervisor makes a recommendation that is "*designed and intended* to produce the adverse employment action,"—that is, where the supervisor's actions were a "causal factor" in the termination decision, and that person was motivated by a discriminatory animus—liability may attach) (quoting *Staub v. Proctor Hosp.*, 131 S.Ct.

1186, 1193 (2011)). So the question becomes whether Scott's decision to retire before the Board of Fire & Police Commissioners' hearing constituted a "constructive termination."

A constructive termination occurs where an employee "was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citations omitted). There are two forms of constructive discharge, but both require that the work environment has become "intolerable." *See id.* In the first form of constructive discharge, the employee resigns due to "working conditions even more egregious than that required for a hostile work environment claim," such as threats of physical violence. *Id.* The second form of constructive discharge takes place "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *E.E.O.C. v. Univ. of Chi. Hosp.*, 276 F.3d 326, 332 (7th Cir. 2002). It does not suffice merely to show that "prospect of discharge lurks in the background"; the employee must show that his working conditions are unbearable. *Chapin*, 621 F.3d at 679-80.

Scott has not established constructive discharge. He has not even attempted to show that the situation at his workplace rose to the level of a hostile work environment, so he cannot establish the first type. As to the second type, Scott has cited no evidence to support his claims that (1) the recommendations to terminate his employment were made a matter of public record, (2) public revelation of those recommendations "made it impossible for [Scott] to continue in his position as commander," and (3) the Board of Fire & Police Commissioners would rubber-stamp his termination based on the recommendations. The court is left with nothing to support the conclusion that Scott was

constructively discharged. Because Scott's constructive discharge is the only adverse employment action he arguably suffered, he cannot make out a *prima facie* case of discrimination under the indirect method of proof.

2. <u>Similarly Situated Comparators</u>

Even assuming *arguendo* that Scott was constructively discharged, he cannot identify any similarly situated comparator that was treated less harshly than he. "The similarly situated analysis requires a context-based examination of all relevant factors." *Eaton*, 657 F.3d at 556 (quoting *South*, 495 F.3d at 752-53) (alteration in original). When "uneven discipline is the basis for a claim of discrimination," generally "the most-relevant similarities are those between the employees' alleged misconduct, performance standards, and disciplining supervisor." *Rodgers v. White*, 657 F.3d 511, 518 (7th Cir. 2011); *see also Hanners v. Trent*, 674 F.3d 683, 693 (7th Cir. 2012) ("[W]hen a plaintiff alleges that he received harsher discipline than other employees, it is necessary for the court to consider whether the employees engaged in the same conduct for which the plaintiff was disciplined.").

Here, Scott points to numerous individuals whom he claims were treated differently. Scott offers very little detail about each individual, and the evidence of record actually works against him by establishing that these people are not similarly situated. For instance, for seven of his purported comparators (Gerry Rodish, Dan Wolff, "Fireman Gonzales," Jerry Bossolono, James Klosak, John Kryzowski and Carl Berger), the court was either not told the identity of the supervisor, or *was* told that the supervisor was neither Dominick nor Iniquez. In addition, none of these people were disciplined for the same type of misconduct (*i.e.*, alleged drug use): Rodish was accused but not

criminally charged with sexual harassment, Wolff was convicted of running a bingo parlor without a license, Gonzales and Bossolono were arrested for some unknown reason, Klosak was "involved" in an incident relating to his purported failure to account for money recovered during an arrest, Kryzowski was charged with domestic violence, and Berger was charged with police brutality. The other two people to whom Scott points are Dominick and Iniquez themselves: Dominick was accused of sexual harassment while he was an elected official, and Iniquez was accused of inadvertently discharging a firearm some twenty-three years prior. Because none of these people share the "most-relevant similiarities" for this type of claim, *see Rodgers*, 657 F.3d at 518, and because Scott has failed to point out any other similarities that this court might take into account, Scott has not identified an appropriate similarly situated comparator.[5] For this reason as well, Scott has failed to make out a *prima facie* case of discrimination under the indirect method.

**B. Direct Proof of Discrimination**

Under the direct method, it is typically said that the plaintiff must present "direct or circumstantial evidence that creates a convincing mosaic of discrimination on the basis of race." *Good*, 673 F.3d at 674 (citation omitted). As Scott points out, however, "the nomenclature is misleading," and the direct method "is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion." *See Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (quotation marks and citation omitted). Instead, the focus is "whether the evidence 'points directly' to a discriminatory reason for the employer's action." *Id.* Such evidence can include "(1) suspicious timing, ambiguous

---

[5] Although not dispositive—the plaintiff need offer evidence as to only one similarly situated comparator, *see Eaton*, 657 F.3d at 556—the court recognizes that the defendants established that three white employees of the police department were arrested and charged with federal offenses, and termination proceedings were initiated against them while Dominick was President and Iniquez was Chief of Police. The defendants did not establish, however, the nature of the charges brought against these individuals.

11

oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; [or] (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009) (alteration in original) (quoting *Sun v. Bd. of Trustees*, 473 F.3d 799, 812 (7th Cir. 2007)).

But even under the expansive view of direct evidence upon which Scott seeks to rely, he cannot prevail. (*See* Mem. in Opp'n to Defs.' Dominick and Iniquez's Mot. for Summ. J. at 7 (quoting *Sylvester v. SOS Children's Vill. Ill., Inc.*, 453 F.3d 900, 901 (7th Cir. 2006).) First, he argues that his alleged similarly situated comparators were treated differently. For all of the reasons already stated, Scott has failed to establish the existence of any similarly situated comparators, dooming this argument.

Next, Scott claims that he was told by Iniquez that if he passed the drug test he would be returned to duty, but despite passing the test he was not returned. As explained above, however, Scott did not "pass" the drug tests. Both tests proved inconclusive: the urine test because the sample was too dilute, and the hair follicle test because not enough hairs could be collected. The court cannot discard common sense and find that Scott should have been treated as though he "passed" the tests.

The only other point Scott makes is that, based on his years on the force, he knew he would be terminated if he did not retire—an entirely unsupported factual allegation that this court is in no position to accept. Thus, Scott has not established any type of

discrimination via the direct method, even taking into account the circumstantial evidence he offers. As Scott has failed to make out a *prima facie* case of racial discrimination under either the direct or indirect method of proof, summary judgment in the defendants' favor is appropriate.[6]

### IV. CONCLUSION

Because the court concludes that Scott failed to make out a *prima facie* case of discrimination, the court grants Cicero's and the individual defendants' motions for summary judgment. The case is dismissed.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: June 6, 2012

---

[6] For this reason, the court need not address any alternative arguments, such as Cicero's claim to be exempt from § 1981 actions or the individual defendants' claim to qualified immunity.